THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JOHN LENNON, DEFENDANT-APPELLANT.

Argued October 31, 1949—Decided December 19, 1949.

*Mr. Joseph Weintraub* argued the cause for appellant (*Mr. Edward R. McGlynn* on the brief, *Messrs. McGlynn, Weintraub & Slein,* attorneys).

*Mr. Wallace S. De Puy,* First Assistant County Prosecutor, argued the cause for the State (*Mr. Walter G. Winne,* County Prosecutor, on the brief).

The opinion of the court was delivered by

HEHER, J. The judgment here is not appealable of right to this Court. It was entered February 9, 1949, after

the Judicial Article of the Constitution of 1947 had become effective; and the appellate process is to be found in that article of the Constitution. Sections 12 and 13 of chapter 367 of the Session Laws of 1948 (*P. L., p.* 1500) have no application. *Shade v. Colgate,* 3 *N. J.* 91. But since the question is *res nova,* the alternative motion for certification is granted and the grounds of appeal will be treated on the merits.

Lennon appeals from a judgment of conviction rendered on an indictment returned August 31, 1948, charging that on or about June 1, 1944, "and from thence continuously until on or about" May 1, 1948, at the Borough of Cliffside Park, in the County of Bergen, in this State, P. James Pellecchia, Lennon, Albert Klausner, John Doe and Richard Roe did knowingly and unlawfully, and with evil intent, conspire and agree together to violate the provision of Title 2, chapter 135 of the Revised Statutes of 1937, "by * * * Pellecchia telephoning bets and wagers, on the running either within or without this State of horses, mares and geldings, to telephones located" in Cliffside Park "maintained and operated for that purpose by the defendants, John Doe, Richard Roe, and Lennon," and the keeping by Lennon of "an account of the bets and wagers made by" Pellecchia, and the payment by Lennon to Pellecchia of the moneys won on the latter's wagers and the collection from Pellecchia by Lennon, either personally or by his agent and servant, Klausner, of the moneys lost on his wagers. Klausner was charged with knowing participation in the making and execution of the conspiracy as the servant and agent of Lennon. Overt acts were alleged and proved, among which were seventeen payments made by Pellecchia to Lennon, ranging from $500 to $3,000, between January 23, 1946, and December 2, 1947. The evidence tended to establish bookmaking in violation of *R. S.* 2:135–3. That was the issue submitted to the jury.

There was a severance as to Pellecchia; and he was sworn as a witness for the State on the trial of Lennon. He testified that during the summer of 1944 he was introduced to Lennon at a race track in Jamaica, New York. The subject matter

of the conversation was the making of wagers on the running of horses, "either at the track or away from the track." Lennon told Pellecchia that he (Lennon) "would book bets at the track; he generally had men there;" and that if he (Pellecchia) "wanted to bet away from the track, bet through what is called a book," he "could 'phone in" his bets. Lennon gave Pellecchia a card listing four telephone numbers through the Cliffside Park exchange and told him that he "could call those numbers," but that he should not call "for two or three days until he could make arrangements" to receive his calls, and in making the calls he "should use the initials J. P." Lennon said that when he "got back to Cliffside he would make the arrangements." The arrangements were made accordingly; and shortly thereafter Pellecchia made bets through Lennon's establishment in Cliffside Park and continued the practice for some four and a half years. during which time the telephone numbers were changed at intervals with notice to him. During this time he made such wagers by telephone "almost daily" except for short periods when he could not meet his accumulated losses. Balances were struck from time to time; and Pellecchia usually made remittances by check to Lennon at a post office box in Cliffside Park, or to Lennon in person at Pellecchia's office in Newark. For several years, Pellecchia received daily statements from Lennon by mail. This practice was discontinued at Pellecchia's request; he feared it would be the means of his exposure. At one time, Pellecchia's unpaid wagers amounted to $40,000; Lennon agreed to reduce this by $10,000 or $12,000 if Pellecchia would make payment of the balance in weekly installments. Pellecchia gave Lennon a series of post-dated checks for the stipulated amount. At another time, Pellecchia's unpaid losses on wagers amounted to $72,000, for which he gave Lennon semi-monthly checks of $1,500 each. Pellecchia was almost continuously in Lennon's "debt" for lost wagers; his total payments to Lennon exceeded $100,000, all moneys embezzled by Pellecchia from a bank of which he was vice-president and counsel. Pellecchia did not at any time visit Lennon's place of business in Cliffside Park. He made the

wagers by the designated telephone with several persons whose voices he did not recognize. He knew Lennon's voice; he did not know Klausner's. He said that he made "bets with more than one individual answering the phone." It is obvious that Lennon conducted the business of bookmaking on an extensive scale commensurate with the large sums wagered by Pellecchia. Lennon did not take the witness stand; indeed, he called no witnesses to meet the case made by the State. Klausner also was convicted.

The proofs sustain the inference that Lennon, Klausner and others conspired to commit the crime of bookmaking in violation of R. S. 2:135-3. Under the statute, an agreement or combination between two or more persons to commit a crime constitutes a conspiracy punishable as a misdemeanor, provided that, with certain exceptions not here pertinent, there was an overt act in furtherance of the object of the agreement by one or more of the parties. R. S. 2:119-1, 2. Bookmaking is a criminal offense. R. S. 2:135-3. But wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event, are merely "unlawful." R. S. 2:57-1. Appellant invokes the rule that where the subtsantive offense necessarily involves concert of action, a charge of conspiracy to commit that offense will not lie. It is said that "a man cannot wager with himself;" and that no evidence of a conspiracy "between Lennon and Klausner was offered as against Lennon." This latter has reference to a purported confession introduced into evidence against Klausner. But the confession acknowledged Klausner's participation in the conspiracy; and Pellecchia's testimony implicated Lennon in the same combination.

The cited principle has no application here. The essence of the charge laid in the indictment is a conspiracy to violate the statute denouncing bookmaking; and the proofs establish such a conspiracy by Lennon, Klausner and those indicated by the fictitious names. The evidence adduced from Pellecchia proves the existence of a combination by his co-defendants to engage in bookmaking as pleaded in the indictment. The

object of the conspiracy was the "making of a book of bets" on horse races. *State v. Morano,* 134 *N. J. L.* 295 (*E. & A.* 1946). A conspiracy to that end by Lennon, Klausner and the two unidentified defendants is within the frame of the indictment and the evidence elicited in support of the charge. The indictment avers that telephones for the transmission of wagers were "maintained and operated" in Cliffside Park "by the defendants, John Doe, Richard Roe and John Lennon." As the indictment is written, the substantive offense of bookmaking is not chargeable to Pellecchia; that offense was laid only to Lennon.

Preconcert of action between Lennon, Klausner and the unidentified persons was not required for the commission of the substantive offense; and the principle of *concursus necessarius* is not apposite, but rather that of *concursus facultativus. Wharton's Criminal Law* (12*th Ed.*), § 1604. Where there is a plurality of agents not necessary to the commission of the substantive crime, the combination is invested with a potentiality for evil that renders it criminal in itself. A combination to commit an offense may be a criminal conspiracy, even though the object is to do what some of the conspirators may be free to do alone. The incapacity of one to commit the substantive offense does not necessarily mean that he may with impunity conspire with others who are able to commit it, for the statute is directed at what Mr. Justice Stone described as "the collective planning of criminal conduct." "The plan is itself a wrong which, if any act be done to effect its object, the state has elected to treat as criminal." *Gebardi v. United States,* 287 *U. S.* 112, 53 *S. Ct.* 35, 77 *L. Ed.* 206 (1932). See, also, *United States v. Rabinowich,* 238 *U. S.* 78, 35 *S. Ct.* 682, 59 *L. Ed.* 1211 (1915); *Vannata v. United States,* 289 *Fed.* 424 (1923).

The statute denounces as a conspiracy an agreement or combination to commit a crime; and since the proofs show a conspiracy by Lennon, Klausner and their unknown accomplices to engage in bookmaking in contravention of the statute, the charge laid in the indictment is made out even though Pellecchia be deemed an essential party to the commission

of the substantive offense and therefore not chargeable as a conspirator. The indictment stated that the design and object of the conspiracy was bookmaking by Lennon; and the evidence indicates voluntary participation by others than Pellecchia in the combination to accomplish that purpose. This is not a case for the operation of the principle that where it is impossible under any circumstances to commit the substantive offense without co-operative action, the preliminary agreement between the same parties to commit the offense is not an indictable conspiracy. As said by Mr. Justice Stone in his footnote to *Gebardi v. United States,* cited *supra,* the conspiracy is also deemed criminal "where it contemplated the co-operation of a greater number of parties than were necessary to the commission of the principal offense." Here, the conspiracy charged and proved included participants who were not indispensable to the consummation of the substantive offense. This is the distinguishing principle. *Vide, Thomas v. United States,* 156 *Fed.* 897 (1907); *McKnight v. United States,* 252 *Fed.* 687 (1918); *Vannata v. United States, supra; Ex parte O'Leary,* 53 *Fed.* 2d 956 (1931).

Plainly, there was a bookmaking combination organized for large-scale betting; and the provision of its facilities to Pellecchia did not serve to subject the members of the combination to criminal responsibility for the substantive offense only. The conspiracy had in view not an isolated bet by Pellecchia, but a long series of wagers through Lennon and his accomplices that in the end covered a period of four and a half years and resulted in the embezzlement of more than $100,000 to meet his losses. It was a sinister combination that held great power for evil, far more perilous to the public welfare and safety than the criminal intent of a single individual and therefore a conspiratorial enterprise subject to indictment. *Vide, Burdick's Law of Crime,* § 984.

It is not requisite that the conspirators know each other, or that they should all join in the common purpose at the same time. *People v. Strauch,* 240 *Ill.* 60, 88 *N. E.* 155 (1909); *Burdick's Law of Crime,* § 999.

The judgment is accordingly affirmed.

CASE, J. (concurring). This appeal is by Lennon only and is from his conviction. There were other men, designated in the indictment as John Doe and Richard Roe, whose identities were unknown but who confederated with Lennon in the violation of our law against bookmaking. The acts done by these three were adequate, I believe, to establish the conspiracy. The fact that a conspirator who committed an essential act in the conspiracy cannot be identified does not affect the general rule that each conspirator is responsible for the acts of his confederates in furtherance of the conspiracy. *Spies v. People*, 122 *Ill.* 1, 12 *N. E.* 865 (*Ill. Supreme Court* 1887). The question of Lennon's guilt under the indictment was fairly put to the jury and the verdict is supported by the proofs referred to above. I vote to affirm.

However, I differ from the reasoning of the majority opinion in some respects, one of which is the effect to be given, on Lennon's appeal, to the testimony against Klausner. Lennon and Klausner were charged in the indictment as coconspirators and were tried together. Neither of them took the stand. The only proof of participation by Klausner was a confession made by him and admitted at the trial as evidence against him only and as having nothing to do with the guilt or innocence of Lennon. In no other way was Klausner connected up with the crime. He was found guilty. But the verdict against Klausner, dependent solely upon proof which was not competent against Lennon, may not, in my judgment, be used with any effect whatsoever against Lennon, and the state does not contend that it should or may be. This appeal goes entirely to the situation as it was at and before the trial. The conviction of Klausner may not properly count against Lennon even to the extent of demonstrating that there was a conspiracy. To my mind the majority opinion does give weight, as against Lennon, to the Klausner incident.

Further, I am not in accord with the extent to which the theory and the application of the crime of conspiracy are carried. Betting, except by the pari-mutuel system, is unlawful in this state. *R. S.* 2:57–1. But the statute places no criminal liability upon the bettor. The indictment herein

charged in general terms that Pellecchia, Lennon, Klausner, John Doe and Richard Roe conspired to violate "the gambling statutes of the State of New Jersey, namely, Title 2, Chapter 135 of the Revised Statutes." During the course of the trial the court confined the accusation to a conspiracy to violate section 3 of that chapter, namely, *R. S.* 2:135–3. That section, in so far as it is relevant, pronounces one guilty of a misdemeanor who shall make what is commonly known as a book upon the running of a horse, or shall conduct the practice commonly known as bookmaking, or shall keep a place to which persons may resort for engaging in any such practice, or for betting upon the event of any horse race; and it includes within its application any one who shall aid, abet or assist in any such acts. It is clear that bookmaking is an act which must be done in concert, that is, there must be the bookmaker who takes the bet and also the bettor who places the bet, and that the statutory offense is visited upon the bookmaker and those who assist him and not upon the bettor. It is a substantive statutory offense, with penalty, to make a book and take bets; it is not a substantive statutory offense, with penalty, to place a bet. Both Lennon and Pellecchia were indicted, not for violating the statute—Pellecchia could not have been indicted on that ground—but for *conspiring* to violate the statute. Thus it comes that Pellecchia, whose betting was not a punishable violation of the statute, is indicted upon the theory that his act of betting was a collaboration with Lennon to carry on the latter's inhibited bookmaking. I am concerned, not about Pellecchia, because his case is not before us, but upon the effect the case may have as a precedent. Lennon could have been indicted and prosecuted for his violation of the substantive statute. Pellecchia stood convicted of the misappropriation of large sums of money which he took and used for his betting operations; but so far as the present indictment is concerned he did nothing but bet; he had no part in the bookmaking. The omission of the bettor from the condemnation of the statute must, in sound reason, be laid to the deliberate intention of the legislature. It is not necessary for us to find a motive in this

splitting of a gambling transaction into its two component parts, making only one of them a crime; but a quite logical motive would be to encourage or compel the bettor at the instance of the prosecuting authorities to disclose facts which he would not be likely or compellable to disclose if in so doing he would involve himself in criminal guilt; or it may be that the purpose was to hold only him who commercializes on such transactions and panders to the weaknesses of men. But whatever the motive or purpose, there is the statute. It is for the courts to pronounce and to construe the law, not to make it. Particularly is this so of the criminal law. Yet there is the growing tendency of grand juries and prosecuting authorities, and, indeed, of courts, in instances where the statute has set up a crime which for its performance requires concerted action, and has made only one phase of the action a punishable crime, to bring all participants—whatever part they took—within the net by the simple, but very subtle and far-reaching, practice of charging them all with conspiracy. This trend reaches into various aspects of life. We recently had before us a case, *In re Vince*, 2 *N. J.* 443, which, while not on all fours, had illustrative points. As a result of the history of the case and of a physical examination it was thought by an attending physician that an abortion had been performed. The young woman was brought before the grand jury and questioned. She refused to answer upon the ground that the answers might tend to incriminate her. The matter came before us, and we studied the case in the light of *R. S.* 2:105–1 which makes it a high misdemeanor for one, with malice or without lawful justification, to administer drugs or use an instrument or other means, with intent to cause or produce the miscarriage of a pregnant woman. We held that a woman who performs an operation upon herself or consents to its performance upon her by others is chargeable criminally only if the child be quick (a condition not present in that case) and that since the woman could not be punished criminally as a result of her testimony her refusal to testify was without justification. Thus there is illustrated the reluctance of a person involved in a criminal act to testify, the willing-

ness to use the rule against self-incrimination as a screen, and the refusal of the court to permit a statute to be misdirected toward a person upon whom guilt was not laid by the statute, even though the guilty act was one which involved concerted action in which such a person participated.

The better rule is that where a concert of action is necessary to the commission of the substantive statutory offense and the statute is directed towards one and not the other participant a charge of conspiracy does not lie, unless, in addition to the necessary concert, other persons participate as conspirators or there is a nefarious element such as the bribing of a public official. It is true that John Doe and Richard Roe participated in the offense but only as the persons who collaborated with Lennon at the bookmaking end of the transaction. Pellecchia did not know who they were, never saw them and knew nothing about them. I do not understand how their participation with Lennon could be used to magnify Pellecchia's actions beyond the mere placing of bets.

I do not develop the thought further because Pellecchia is not before us, and the court decision is not made to depend upon his alleged participation in the conspiracy. However, the majority opinion, as I read it, does assume the propriety of the inclusion of him within the indictment and of the finding of guilt against him; and I wish to note that I am not in accord with that assumption. The subject was recently (March 28, 1949) treated at length by Mr. Justice Jackson in his concurring opinion (in which Justices Frankfurter and Murphy joined) in *Krulewitch v. United States*, 336 *U. S.* 440, 93 *L. Ed.* (*Advance Sheets No.* 11, *p.* 623).

CASE, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For reversal*—None.